**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| INDUSTRIAL PRINT TECHNOLOGIES, LLC,<br><br>     Plaintiff<br><br>v. | **THIS DOCUMENT RELATES TO CASES -165, -1100, -1104, -1195**<br><br>The Honorable Barbara M.G. Lynn |
| CENVEO, INC. and<br>HEWLETT-PACKARD COMPANY | CASE NO. 3:15-CV-00165-M |
| O'NEIL DATA SYSTEMS, INC. and<br>HEWLETT-PACKARD COMPANY | CASE NO. 3:15-CV-01100-M |
| O'NEIL DATA SYSTEMS, INC. and<br>HEWLETT-PACKARD COMPANY | CASE NO. 3:15-CV-01101-M |
| QUAD/GRAPHICS, INC. and<br>HEWLETT-PACKARD COMPANY | CASE NO. 3:15-CV-01103-M |
| O'NEIL DATA SYSTEMS, INC. and<br>HEWLETT-PACKARD COMPANY | CASE NO. 3:15-CV-01104-M |
| VISTAPRINT U.S.A., INC. and<br>HEWLETT-PACKARD COMPANY | CASE NO. 3:15-CV-01106-M |
| FORT DEARBORN COMPANY and<br>HEWLETT-PACKARD COMPANY,<br><br>     Defendants. | CASE NO. 3:15-CV-01195-M |

**IPT'S OPPOSITION TO DEFENDANTS HP INC., O'NEIL DATA SYSTEMS INC.,
CENVEO, INC. AND FORT DEARBORN COMPANY'S MOTION TO DECLARE THIS
AN EXCEPTIONAL CASE FOR ATTORNEYS' FEES AND COSTS**

<u>**PUBLIC VERSION**</u>

# Table of Contents

I.   Introduction ............................................................................................................1

II.  Legal Standards .....................................................................................................3

III. Defendants Should Not Be Deemed The Prevailing Parties .................................5

IV.  The Court Should Exercise Its Discretion To Deny Fees and Costs Even If Defendants
     Are Considered Prevailing Parties ........................................................................7

     A.  IPT's Claims Against Defendants Are Meritorious ........................................7

         1.  IPT's Pre-suit Investigations Complied With Rule 11 And Thus Do Not Weigh
             In Favor Of Finding This Case Exceptional .........................................7

         2.  The Substantive Strength Of IPT's Litigation Position Remained Strong .................12

             a.  There Is Ample Proof That HP Indigo Presses Are Designed To Practice The
                 Infringing Methods .........................................................................13

             b.  Discovery From HP Corroborates That Fort Dearborn, Cenveo and O'Neil
                 Have Each Processed Some Variable Data Print Job Using The Accused
                 Methods ...........................................................................................15

             c.  Fort Dearborn Admitted Using JLYT Processing of Variable Data Print Jobs .....16

             d.  Cenveo Was Dismissed Based On Representations That The "Majority" Of
                 Its Print Jobs Use Non-Optimized PDF Processing ............................17

             e.  O'Neil Was Dismissed Based On Representations That "In General" Its Print
                 Jobs Use Non-Optimized PDF Processing .........................................18

     B.  IPT's Discovery Conduct Was Reasonable And Tailored And Does Not Provide A
         Basis For Finding This Case To Be Exceptional ............................................21

V.   Even If Permitted, Defendants' Bill of Costs Is Overreaching With Substantial Portions
     Being Unrecoverable Under 18 U.S.C. § 1920 .....................................................23

     A.  Fees Charged By Mediator Hesha Abrams Are Not Recoverable ..................24

     B.  Fees For *Markman* Demonstratives Are Not Recoverable ...........................24

     C.  Fees For Court Appointed Expert ................................................................25

VI.  Conclusion ...........................................................................................................25

## Table of Authorities

**Cases**

*Astornet Techs., Inc. v. BAE Sys., Inc.*,
  No. 14-cv-245, 2016 U.S. Dist. LEXIS 102260 (D. Md. Aug. 4, 2016) ................................ 5, 6
*Baisden v. I'm Ready Productions, Inc.*,
  793 F. Supp. 2d 970 (S.D. Tex. 2011) .................................................................................. 25
*Butler v. Munsch Hardt Kopf & Harr, P.C.*,
  3:02-CV-1811, 2005 U.S. Dist. LEXIS 6661 (N.D. Tex., April 12, 2005) ............................ 24
*Coats v. Penrod Drilling Corp.*,
  5 F.3d 877 (5th Cir. 1993) ................................................................................................... 25
*Cook Children's Med. Ctr. v. New England PPO Plan*,
  491 F.3d 266 (5th Cir. 2007) ............................................................................................... 24
*CreAgri, Inc. v. Pinnaclife, Inc.*,
  No. 11-cv-6635, 2014 U.S. Dist. LEXIS 77484 (N.D. Cal. June 3, 2014) ............................ 7, 8
*Credit Card Fraud Control Corp. v. Maxmind, Inc.*,
  No. 3:14-cv-3262, 2016 U.S. Dist. LEXIS 83089 (N.D. Tex. Apr. 7, 2016) ...................... 7, 12
*Cybor Corp. v. FAS Techs., Inc.*,
  138 F.3d 1448 (Fed. Cir. 1998) ............................................................................................. 4
*Farrar v. Hobby*,
  506 U.S. 103 (1992) ............................................................................................................. 3
*Fraser v. High Liner Foods (USA), Inc.*,
  337 Fed. App'x 883 (Fed. Cir. 2009) .................................................................................... 9
*Gaymar Indus., Inc. v. Cincinnati Sub-Zero Prods., Inc.*,
  790 F.3d 1369 (Fed. Cir. 2015) ............................................................................................ 4
*Highway Equip. Co. v. FECO, Ltd.*,
  469 F.3d 1027 (Fed. Cir. 2006) ............................................................................................ 6
*Int'l Intellectual Mgmt. Corp. v. Lee Yunn Enters.*,
  No. 8-cv-7587, 2009 U.S. Dist. LEXIS 132872 (C.D. Cal. Dec. 14, 2009) ......................... 9
*Micromesh Tech. Corp. v. Am. Rec. Prods.*,
  No. 6-cv-6030, 2007 U.S. Dist. LEXIS 64241 (N.D. Cal. Aug. 29, 2007) ........................... 12
*Modine Mfg. Co. v. Allen Grp., Inc.*,
  917 F.2d 538 (Fed. Cir. 1990) .............................................................................................. 4
*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
  134 S. Ct. 1749 (2014) ............................................................................................. 3, 4, 7, 12
*Park-In-Theatres, Inc. v. Perkins*,
  190 F.2d 137 (9th Cir. 1951) ................................................................................................ 4
*Pharmacia & Upjohn Co. v. Mylan Pharms., Inc.*,
  182 F.3d 1356 (Fed. Cir. 1999) ............................................................................................ 3
*Q-Pharma, Inc. v. Andrew Jergens Co.*,
  360 F.3d 1295 (Fed. Cir. 2004) ............................................................................................ 7, 8

*SFA Sys., LLC v. Newegg, Inc.*,
   793 F.3d 1344 (Fed. Cir. 2015) .................................................................................. 4
*U.S. EEOC v. W&O, Inc.*,
   213 F.3d 600 (11th Cir. 2000) .................................................................................. 25
*United States v. DKG Appaloosas, Inc.*,
   829 F.2d 532 (5th Cir. 1987) .................................................................................... 4
*Wiley v. RockTenn CP, LLC*,
   No. 4:12-cv-226 2014, U.S. Dist. LEXIS 138399 (E.D. Ark. Sept. 30, 2014) ........................... 4

**Statutes**

28 U.S.C. § 1295(a)(1) ................................................................................................. 3
35 U.S.C. § 285 ................................................................................................ 3, 4, 6, 7

**Rules**

Fed. R. Civ. P. 11 ...................................................................................................... 7, 8
Fed. R. Civ. P. 54 ................................................................................................ 3, 4, 24

I.     **Introduction**

Defendants' motion asking the Court for an exceptional case finding and award of attorney fees and costs is baseless. There is nothing exceptional about the merits of IPT's case or its discovery conduct. As detailed below, and in the accompanying declarations, IPT stipulated to the dismissal of its claims against O'Neil, Cenveo, and Fort Dearborn (and derivative claims against HP) as a matter of practicality for the benefit of all parties involved. It did so despite evidence that these Defendants have infringed its patents or, at a minimum, failed to produce discovery demonstrating that they have not infringed.

IPT's variable data printing patents include only method claims. Direct infringement occurs when entities running HP's Indigo presses operate them to perform variable data jobs in modes that practice the patented methods. The HP Indigo presses are not only fully capable of performing these methods, as IPT's retained technical expert confirmed in his recently-served expert report, they are designed to do so when processing many of the page description specification files types supported by the presses.

IPT and its counsel performed a thorough pre-filing investigation as required by the Rules, and reasonably concluded that infringement by each Defendant was not only probable, but highly likely. After complaints were filed in January 2014 and January 2015, IPT sought the basic fact discovery to which it was entitled under the Rules, which Defendants ignored and resisted at every turn. IPT eventually obtained discovery sufficient for its expert to submit a detailed report establishing how the HP Indigo presses are designed to process a variety of file types (e.g., PPML, PPML/T, JLYT, PDF and PDF/VT) in an infringing manner. Fact discovery also revealed that when the Indigo presses process PDF files with the "Optimized PDF" setting turned off, the press does not save and reuse static bitmaps in the manner required by the patents.

Contrary to Defendants' motion, that the Indigos can be operated in a non-infringing way does not establish that these Defendants have not infringed. Fort Dearborn has admitted using the JLYT file type for variable data jobs, which IPT's expert has opined is processed per the infringing methods. Neither O'Neil nor Cenveo has ever unequivocally denied ███████████████ file types that IPT's expert concluded are processed in an infringing way. Nor did they produce business records corroborating exactly which file types and modes of operation have been used. Instead, they served carefully worded interrogatory answers that only represent that ████████ or a "majority" of the time they have used PDFs processed in the non-Optimized way. Other evidence obtained from HP confirms that O'Neil and Cenveo have used other page description file types, including ███████████ which IPT's expert opines are processed by the presses in an infringing manner.

In stark contrast to Defendants' characterizations in their motion, there was no early notice, explanation or discovery given to IPT relevant to Defendants' eventual assertions that they do not infringe because of their non-use of the "Optimize PDF feature." What really happened is that their litigation tactics of providing "general" interrogatory responses and claiming a lack of business records on the relevant aspects of the accused printing processes forced IPT to make a pragmatic decision. Would the additional expense of continuing the litigation likely be economically justified? IPT decided that the better course of action was to dismiss these claims and focus resources on other aspects of the broader litigation involving HP Indigo presses. In these circumstances, there is nothing "exceptional" about IPT's decision to narrow the consolidated litigation by voluntarily dismissing its claims against these Defendants without any finding adverse to IPT on the merits.

Nor does IPT's discovery conduct merit finding this case to be exceptional. This Court is familiar with many of the discovery obstacles IPT has encountered in this case. IPT continually attempted to work with Defendants on discovery issues, always seeking only the discovery relevant to the patent claims and never demanding or having any interest in anything beyond that. Defendants, of course, have always known what types of variable data jobs they run. They repeatedly delayed providing those details, and ultimately never provided complete discovery of these central facts. After IPT successfully moved to compel, both Magistrate Stickney and this Court heard the arguments Defendants now rehash in their motion, and rejected them, ordering Defendants to instead pay IPT's fees and costs. (ECF No. 97.) Defendants eventually provided some additional discovery, but now incredibly seek costs and fees for doing what the Court ordered them to do. Defendants' motion attempts to further penalize the victim of their own unreasonable discovery conduct.

IPT respectfully requests that this Court deny Defendants' motion in full.

## II.    Legal Standards

Before the Court can consider Defendants' request for costs under Rule 54 and attorneys' fees under § 285, it must first determine whether Defendants qualify as "prevailing parties." Fed. R. Civ. P. 54; 35 U.S.C. § 285. A party prevails when it "obtains actual relief on the merits of his claim" that "materially alters the legal relationship between the parties." *Farrar v. Hobby*, 506 U.S. 103, 111 (1992).

The Court may award attorneys' fees to a prevailing party in exceptional cases. 35 U.S.C. § 285. Federal Circuit law guides a request to find a case exceptional under § 285. *See* 28 U.S.C. § 1295(a)(1); *Pharmacia & Upjohn Co. v. Mylan Pharms., Inc.*, 182 F.3d 1356, 1359 (Fed. Cir. 1999). Under *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014),

a finding that a case is exceptional under § 285 requires a preponderance of the evidence that the case "stands out from others with respect to substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." There is no bright-line rule for determining whether a case is exceptional; instead, the Court must consider the totality of the circumstances, including the movant's own conduct. *Id.* at 1756–57; *Gaymar Indus., Inc. v. Cincinnati Sub-Zero Prods., Inc.*, 790 F.3d 1369, 1373 (Fed. Cir. 2015). The Supreme Court has "made clear that it is the 'substantive *strength* of the party's litigating position' that is relevant to an exceptional case determination, not the *correctness* or eventual success of that position." *SFA Sys., LLC v. Newegg, Inc.*, 793 F.3d 1344, 1348 (Fed. Cir. 2015) (emphasis in original) (citing *Octane Fitness*, 134 S. Ct. at 1756).

If a district court does determine that a case is exceptional, the court still must determine whether attorney fees are appropriate. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1460 (Fed. Cir. 1998) (citations omitted); *see also Modine Mfg. Co. v. Allen Grp., Inc.*, 917 F.2d 538, 543 (Fed. Cir. 1990) ("[e]ven an exceptional case does not require in all circumstances the award of attorney fees"); *Wiley v. RockTenn CP, LLC*, No. 4:12-cv-226 2014, U.S. Dist. LEXIS 138399 at *8–9, 22 (E.D. Ark. Sept. 30, 2014) ("Even if this were an exceptional case, the Court would exercise its discretion to decline to award fees"). Importantly, fee awards are not to be used "as a penalty for failure to win a patent infringement suit." *Octane Fitness*, 134 S. Ct. at 1753 (quoting *Park-In-Theatres, Inc. v. Perkins*, 190 F.2d 137, 142 (9th Cir. 1951)).

Similarly, the decision to award or deny costs remains within the Court's discretion. While Rule 54(d) creates a presumption that the prevailing party will be awarded costs, it is a rebuttable one. *United States v. DKG Appaloosas, Inc.*, 829 F.2d 532 (5th Cir. 1987).

### III.     Defendants Should Not Be Deemed The Prevailing Parties

The Court's dismissal did not address the merits of IPT's infringement claims or Defendants' defenses. (ECF No. 181.) Rather, the Court dismissed IPT's claims pursuant to a stipulation of dismissal. (ECF No. 180.) As discussed further below, IPT maintains that Defendants have each infringed the asserted patents. IPT served the report of its technical expert, Mr. Gafford, on December 23, 2016 in the related consolidated cases. The Gafford Report discloses qualified expert opinions that the methods performed by HP Indigo printers to process variable data jobs specified in any of PPML, PPML/T or JLYT infringe numerous asserted claims, and that jobs set up in PDF or PDF/VT with the Optimized setting turned on also infringe. (A1322–1480 at 1387, 1434–35.) Fort Dearborn admitted using the JLYT file type that Mr. Gafford opines is processed per the infringing methods. (Maloney Decl. ¶ 22.) O'Neil and Cenveo represented only that they ███████████████████████████████████████████████████████. (*Id.* ¶¶ 23, 25–26.) Other evidence from HP strongly suggests, and appears to conclusively prove, that these Defendants have also used one or more of ██████████████████████ for variable data jobs. (*Id.* ¶ 21.) Considering the uncertainty regarding the amount of damages that could be established on the flimsy record provided by these Defendants in discovery, IPT chose to dismiss its claims and focus scarce resources on the other pending cases. None of the dismissed Defendants obtained a judicial resolution of the claims on the merits. Instead, they waived the opportunity to do so by stipulating to the voluntary dismissal of the claims.

Defendants cite two distinguishable cases. First, in *Astornet Technolgies, Inc. v. BAE Systems, Inc.*, No. 14-cv-245, 2016 U.S. Dist. LEXIS 102260, at*2–3 (D. Md. Aug. 4, 2016), the defendant filed a motion to dismiss the plaintiff's infringement claims, arguing that the plaintiff's exclusive remedy was to bring suit against the United States in the Court of Federal Claims, and

not against defendant. After the court granted the motion on the merits and dismissed the claims with prejudice, it held that the defendant was a prevailing party because it had achieved the relief that it had argued from the start of the case. *Id.* at *10-11.

The facts in this case are nothing like *Astornet*. Defendants did not file a motion to dismiss IPT's claims on the merits; the Court never addressed the merits of IPT's claims or Defendants' defenses. Rather, IPT voluntarily dismissed its claims without any concession of non-infringement or ruling by the Court on their merits.

Defendants also cite to *Highway Equipment Co.. v. FECO, Ltd.*, 469 F.3d 1027, 1035 (Fed. Cir. 2006). In *Highway Equipment*, on the eve of trial, the plaintiff filed a declaration and covenant not to sue agreeing not to sue the defendant for infringement of the asserted patents based on products the defendant had made or was making as of that date. *Id.* at 1030. In response, the defendant moved to dismiss the claims with prejudice, which the plaintiff opposed. *Id.* The court granted defendant's motion, dismissed the claims with prejudice in light of the covenant not to sue, and declared the defendant the prevailing party for purposes of § 285. *Id.* There is no indication that *Highway Equipment* involved the type of circumstance presented here, where IPT has proffered credible evidence of infringement for each Defendant but stipulated to dismiss because the magnitude of infringing activity appears to have been small, such that recoverable damages do not justify further litigation costs.

Defendants here prevailed only in the sense that they got away with failing to produce the discovery necessary for IPT to fully prepare its case. They won nothing on the merits. They should not be rewarded in this circumstance by being deemed prevailing parties.

**IV.    The Court Should Exercise Its Discretion To Deny Fees and Costs Even If Defendants Are Considered Prevailing Parties**

    **A**.    **IPT's Claims Against Defendants Are Meritorious**

The Court must consider the totality of the circumstances. *Octane Fitness*, 134 S. Ct. at 1756–57. "If a party has set forth some good faith argument in favor of its position, it will generally not be found to have advanced exceptionally meritless claims." *Credit Card Fraud Control Corp. v. Maxmind, Inc.*, No. 3:14-cv-3262, 2016 U.S. Dist. LEXIS 83089, at *7 (N.D. Tex. Apr. 7, 2016) (J. Lynn) (internal citations omitted).

        **1.    IPT's Pre-suit Investigations Complied With Rule 11 And Thus Do Not Weigh In Favor Of Finding This Case Exceptional**

Whether a pre-suit investigation was adequate is a factor in the totality of circumstances that a Court must consider under the § 285 exceptional case inquiry set forth by the Supreme Court in *Octane Fitness*. *Id.* at *6; *CreAgri, Inc. v. Pinnaclife, Inc.*, No. 11-cv-6635, 2014 U.S. Dist. LEXIS 77484, at *22 (N.D. Cal. June 3, 2014). Presuit investigations are governed by Rule 11, which by its plain language requires that claims and contentions be based upon "an inquiry reasonable under the circumstances." The Federal Circuit has held this requirement is satisfied when an attorney interprets the asserted patent claims and compares the accused device with those claims before filing a claim alleging infringement. *Q-Pharma, Inc. v. Andrew Jergens Co.*, 360 F.3d 1295, 1300 (Fed. Cir. 2004). As shown in the accompanying declarations of the inventor, Mr. Gauthier, of Acacia Technology's VP of Engineering, Mr. Raasch, and of IPT's lead counsel, Tim Maloney, an extensive pre-filing investigation was conducted. It supported the reasonable conclusion that Defendants have infringed by using HP Indigo presses to process variable data print jobs.

These pre-suit investigations were more than adequate to meet the requirements of Rule 11. The investigation involved reviewing the asserted patents and their file histories to assess the

scope of the claims. (*See, e.g.*, Maloney Decl. ¶¶ 4–7.) The work also involved review of publicly-available information regarding HP's Indigo presses, industry studies and market analyses, technical documents describing how variable data printing is accomplished, technical documents regarding the page description specifications used by Indigo presses to run variable data print jobs, HP press releases and marketing materials touting the variable data capabilities of its Indigo presses, HP software user guides, and information regarding Fort Dearborn, O'Neil and Cenveo's printing operations. (Raasch Decl. ¶¶ 6, 9–16; Gauthier Decl. ¶¶ 12–24; Maloney Decl. ¶¶ 4–16.) Mr. Gauthier's extensive experience and knowledge of the printing industry was also utilized. (*See, e.g.*, Maloney Decl. ¶¶ 4, 8, 10.) Based on the information gathered and the technical and legal assessments performed, IPT's lead counsel determined that there was a reasonable basis to conclude that companies using HP Indigo presses to perform variable data jobs have infringed claims of the asserted patents. (*Id.* ¶ 12.) This conclusion was supported for all page description file types known from public information to be used by HP Indigo presses for VDP jobs, including PPML, PPML/T, JLYT and PDF. (*Id.*) The pre-suit investigation further confirmed that each of Fort Dearborn, O'Neil and Cenveo used HP Indigo presses for these types of jobs. (*Id.* ¶¶ 13–16.) After counsel carefully considered the potential patents and claims therein that could be asserted, and after consideration of each element of those claims, the cases against Defendants were filed with the good-faith belief that Defendants infringed the asserted patents. (*Id.*)

These investigations meet the requirements of Rule 11. *Q-Pharma*, 360 F.3d at 1300–03; *CreAgri*, 2014 U.S. Dist. LEXIS 77484 at *27–32. Nothing about the excerpts of pre-suit discussions between Mr. Gauthier and Acacia cited on page nine of Defendants' brief suggests otherwise. Moreover, Defendants fail to cite any publicly-available information that would have somehow shown a lack of reasonable basis to allege infringement. Indeed, the reasonableness of

the pre-filing investigation is further confirmed by the fact that IPT's expert has now opined that numerous claims, as interpreted by the Court, are infringed by the processes performed by the Indigo presses to run variable data jobs specified in any of PPML, PPML/T, JLYT, Optimized PDF or Optimized PDF/VT. (A1322–1480 at 1395–1434.) Mr. Gafford's expert opinions regarding infringement align completely with the conclusions reached as a result of the pre-filing investigations conducted by and on behalf of IPT. (*See* Maloney Decl. ¶¶ 12, 22.)

The case law cited by Defendants is inapposite. (ECF No. 188 at 9.) In *International Intellectual Management Corp. v. Lee Yunn Enterprises*, No. 8-cv-7587, 2009 U.S. Dist. LEXIS 132872, at *4 (C.D. Cal. Dec. 14, 2009), the plaintiff IIMC appears to have failed to make any pre-filing investigation at all and submitted evidence that the court found "not credible" and contradictory of other evidence it submitted. The plaintiff could have, but did not, perform "essential testing" to determine whether a "heat treating" step was performed on the accused products (blankets), and admitted that such testing was necessary to prove its claims. *Id.* Moreover, the exceptional case finding was not based solely upon this lack of pre-filing investigation. *See generally id.* Here, IPT and its counsel did perform a thorough pre-filing investigation as explained above, and formed a reasonable belief that the HP Indigo presses, as operated by each Defendant, performed the claimed methods.

Defendants also rely upon *Fraser v. High Liner Foods (USA), Inc.*, 337 Fed. App'x 883, 889 (Fed. Cir. 2009) as allegedly supporting the notion that "asserting an infringement theory for a method claim merely based on one potential use of a multi-purpose structure is baseless." (ECF No. 188 at 9.) *Fraser* does not stand for this broad proposition. Instead, the Federal Circuit affirmed an award of Rule 11 sanctions based upon very different facts. The asserted patent in *Fraser* covered a method for preparing a fish product that required immersing a fish fillet in room

temperature oil, covering the fillet with crumbs, and then freezing. The *pro se* plaintiff asserted infringement based upon the fact that vegetable oil was listed as an ingredient in the defendants' finished products, despite the fact that the defendants had provided evidence that they did not immerse their fillets in oil (and that their fillets were always frozen). The court also dismissed several defendants for procedural reasons, including: (i) failing to properly effect service upon one defendant; (ii) naming a corporation as a defendant that was dissolved prior to the damages period; (iii) and naming a bankrupt corporation as a defendant. The court found that under these circumstances, sanctions of $500 per defendant were appropriate.

The *Fraser* case is far afield from the facts at hand, and there are no grounds for concluding that any of IPT's infringement assertions were baseless. Defendants' claim that IPT should have used discovery from HP and O'Neil in the first case to inform its pre-filing investigations of the later-filed cases also lacks merit. (ECF No. 188 at 10–11, 13.) They fail to identify any information HP or O'Neil produced that would have given IPT the "opportunity and means to make an informed decision on whether additional suits were necessary and who the appropriate parties should be." (*Id.*) Nor could they, since, as detailed below, when the later cases were filed, HP and O'Neil were already entrenched in tactics designed to mislead IPT regarding the relevant facts by refusing to produce discoverable documents and providing incomplete, misleading responses (or no response at all). In any event, the accompanying declarations establish that additional investigations, appropriate under the circumstances, were conducted before the cases against Fort Dearborn and Cenveo were filed. (Raasch Decl. ¶¶ 19–20; Maloney Decl. ¶¶ 15–16.)

IPT's initial infringement contentions, served without the benefit of meaningful discovery, further demonstrate the reasonable of its pre-suit investigations. (*Id.* ¶ 17.) Defendants' characterization of the contentions are also misleading. (ECF No. 188 at 10–11.) The April 7, 2014

10

contentions addressing HP/O'Neil are 126 pages of detailed legal and factual contentions and analysis (Defendants only provided this Court with three pages) and cite 17 supporting documents from reliable sources, including from HP itself. These are far from "general use" allegations. (*See* A332–458.) The February 2015 contentions addressing HP/O'Neil (for the later-asserted '028 patent) (A459–483), and the May 2015 contentions address HP/Cenveo (A485–714) and HP/Fort Dearborn are similarly detailed (A715–947). Indeed, contrary to Defendants' assertion, these contentions each clearly support that IPT had performed an extensive pre-suit investigation based upon publicly-available information. They support IPT's reasonable belief, based upon that information, that Defendants infringe the asserted method claims.

Defendants confusingly point to deposition testimony of Acacia Research Group LLC's corporate witness (Ms. Wagner) that during the due diligence period before Acacia acquired Mr. Gauthier's patents, "[c]laim charts would have been generated." (ECF No. 188 at 11 (citing A373).) That is entirely consistent with the statements of the declarants herein regarding the due diligence performed. The charts appear on IPT's privilege log. (A1481–88.) Defendants' flimsy assertions of misconduct certainly do not justify IPT having to produce privileged information to rebut them. In addition, Ms. Wagner was not testifying as to whether "IPT believed any other parties were infringing" since it was a third-party deposition of ARG. (ECF No. 188 at 11–12.)[1]

Ms. Wagner's October 11, 2016 deposition is also irrelevant. There she served as IPT's corporate representative on ***financial*** topics. No topic was related to IPT's pre-filing investigation. (A1489–97.) Ms. Wagner explained that she did not have access to the information regarding the extent of use by each defendant that would form the basis of a damages claim. (A1498–1502 at

---

[1] This Court previously denied Defendants' request to add ARG as a counter-defendant in this case, finding that ARG has "no legal interest in the asserted patents." (ECF No. 19 at 3.)

213:24–216:7.) Of course she didn't, because Defendants had previously sought and obtained an order precluding Ms. Wagner from viewing any information designated as "Confidential" or "Attorneys Eyes Only," which is nearly the entirety of their document productions. (ECF No. 178.) Ms. Wagner's degree of knowledge regarding the extent of Defendants' usage of the patents proves nothing relevant to the reasonableness of IPT's pre-filing investigation.

Finally, Defendants' insinuations based on a previous court decision from a decade ago regarding the alleged conduct of Acacia Technology Group and a subsidiary unrelated to IPT in an unrelated case have no place here. (ECF No. 188 at 12 (citing *Micromesh Tech. Corp. v. Am. Rec. Prods.*, No. 6-cv-6030, 2007 U.S. Dist. LEXIS 64241 (N.D. Cal. Aug. 29, 2007).) This is not that case. Here, Defendants have made no showing of anything improper about the pre-suit investigation or IPT's continued pursuit of its claims during discovery. Thus, their motion must fail. *See also Maxmind*, 2016 U.S. Dist. LEXIS 83089, at *8 (discarding similar arguments about an Acacia subsidiary).

## 2. The Substantive Strength Of IPT's Litigation Position Remained Strong

For a case to be exceptional under *Octane Fitness*, the lack of "substantive strength of a party's litigating position (considering both the governing law and the facts of the case)" must "stand out" from others. 134 S. Ct. at 1756. Unlike other cases awarding fees, the strength of IPT's infringement case is and always has been strong, not weak. These Defendants were dismissed solely because it eventually came to light that the extent of their infringing acts likely does not justify further expensive litigation. This reason is proper. *See Maxmind*, 2016 U.S. Dist. LEXIS 83089, at *10 (dismissing in light of limited damages was a legitimate business reason).

That this result was not achieved sooner is largely the result of Defendants failing to abide by their discovery obligations. Their motion now attempts to paint a very different picture of how

12

this case evolved. But the true facts demonstrate that IPT acted as a responsible litigant should, and that its litigation positions and conduct do not provide a basis to find this case exceptional.

### a. There Is Ample Proof That HP Indigo Presses Are Designed To Practice The Infringing Methods

IPT's initial infringement disclosures demonstrate a good faith basis for its assertions that the HP Indigo presses used by Defendants necessarily infringe when operated to process variable data jobs set up using PPML, PPML/T or JLYT file types. (Maloney Decl. ¶ 17.) These preliminary contentions were entirely validated by this Court's Claim Construction Order (ECF No. 32) and the discovery taken from HP to confirm how the Indigo presses process these types of jobs. This is shown by Mr. Gafford's expert reports served in the remaining consolidated cases. Applying the Court's claim constructions, Mr. Gafford opines the Indigo presses necessarily infringe numerous claims when operated to run these jobs. (A1322–1480 at 1387, 1434–35.) Although the reports were served after the claims against Fort Dearborn, O'Neil and Cenveo were dismissed, Mr. Gafford's conclusions are based on direct evidence from HP as to how its presses process these jobs. His analysis demonstrates that infringement occurs when any HP customer runs one of these job types on their HP Indigo press. (Maloney Decl. ¶ 17.)

IPT also confirmed during discovery that the Indigo presses are programmed to process variable data jobs set up using various versions of PDF, including one called PDF/VT. The presses use an additional RIP program, developed by Global Graphics, for processing these file types. This "Harlequin" RIP was designed to perform the infringing methods when the user selects an option to run the PDF job type in the "Optimized" mode (f/k/a "Retained Raster" mode).

HP and Global Graphics have highly touted the benefits of this processing mode. For example, one Global Graphics Case Study published in conjunction with HP discusses how they

collaborated to develop the Optimized PDF feature to significantly increase the speed at which HP Indigo presses process variable data jobs:

> In the case of handling variable data, for some years now Global Graphics has been extending the "PDF retained raster" feature in the RIP and this, together with the post-RIP stitching facilities provided by HP Indigo, has achieved some significant performance improvements. How does PDF retained raster work? "The RIP deconstructs the pages into foregrounds and backgrounds" says Martin Bailey, "and intelligently detects those backgrounds that are shared between multiple pages. The shared backgrounds are rendered just once - that could be once instead of 50,000 times - and as they often contain all the complex graphics on the page, the performance increase is significant.

(A1504.) Another Global Graphics document, *Do PDF/VT Right, How to Make Problem Free PDF Files for Variable Data Printing*, which lists HP Indigo as a sponsor, also promotes the benefits of Optimized PDF processing. (A1505–74.) PDF/VT is a version of PDF specifically developed to be used in variable data printing, and includes the ability to designate static elements as reusable. (A1322–1480 at 1377.) In a section introduced by the catch phrase "RIP ONCE, USE MANY TIMES," the document illustrates the concepts underlying how the RIP operates in the HP Indigo presses:



(A1534–35.) As shown, the repeating static elements, including the logo and static text, are RIPed into a static template bitmap, which is repeatedly merged with variable element bitmaps to generate multiple personalized copies of the page. This practices core aspects of the IPT patents.

After confirming in discovery that the HP Indigos are equipped with the Harlequin RIP for processing PDF files, IPT served updated infringement contentions confirming that the asserted claims also apply to this mode of processing variable data PDF jobs. In the recently served expert reports, Mr. Gafford also provides his independent opinion that the Optimized PDF processing executed by the HP Indigo presses also infringes several asserted claims. (A1322–1480 at 1410–13, 1422–34.)

O'Neil and Cenveo now loosely contend that they operate their presses with the Optimized PDF feature deactivated. As addressed further below, they have certainly not produced reliable evidence establishing that this is true across all of their HP Indigo variable data jobs. Regardless, none of the publicly-accessible documents regarding the Optimized PDF feature indicate that the feature may be turned off. Indeed, this would seem counter to all the development and marketing effort Global Graphics and HP put into the feature. Thus, it was logical and reasonable for IPT to initially infer that HP Indigo presses always process variable data PDFs in this manner. The ability to process PDFs without using the Optimized PDF feature was not revealed until a January 2016 deposition of an HP software architect—a fact that Defendants admit. (ECF No. 188 at 16–17; *see also* Maloney Decl. ¶ 19.) Subsequent discovery was needed to confirm this detail and to determine how it applies to the customer Defendants. At no point prior to this, in response to any discovery, including interrogatories asking for non-infringement positions, did any Defendant assert this as a defense. Yet they now fault IPT for not knowing what even Defendants apparently had not known about their own printing operations.

> **b. Discovery From HP Corroborates That Fort Dearborn, Cenveo and O'Neil Have Each Processed Some Variable Data Print Job Using The Accused Methods**

HP produced records known as Job Origin Reports (JORs) on October 20 and November 2, 2015. HP's corporate witness, Mr. Chad Stevens, explained in March of 2016 that ██████



. (A1071 at 28:20–29:4.)

. (A1072–

73 at 41:13–42:12.) As explained in IPT's expert report on infringement, HP Indigo press infringe

when they process variable data jobs in the PPML or JLYT file types, and when they process

PDF/VT in the Optimized mode. (A1322–1480 at 1387, 1434–35.)[2]

HP only provided JORs from select months within the time frame of 2011–2015. In

addition, not all of the JORs contain ████████████ However, a review of the JORs

that do contain this data confirms that ████████████████

████████████████ (which is a file type emphasized in Global

Graphic's literature as well-suited for Optimized PDF processing). A summary of these JORs is

found in the Appendix at A1074–1133.[3] Given this evidence, it was plainly not unreasonable for

IPT to maintain its cases against these Defendants.

### c. Fort Dearborn Admitted Using JLYT Processing of Variable Data Print Jobs

The complaint against Fort Dearborn was filed January 2015. The case was stayed until an

initial MDL scheduling conference in June 2015. (ECF No. 5.) Fort Dearborn largely failed to

produce business records establishing the relevant details of its printing operations, providing a

mere 98 mere documents over the course of the entire litigation. However, consistent with HP's

---

[2] Defendants continually assert that "standard" PDFs cannot meet the patent claims. However, the PDF standards, as well as the indisputable evidence regarding the Global Graphics Harlequin RIP, confirm that HP Indigo printers are capable of processing PDFs in an infringing manner.
[3] IPT's damages expert, Michele Riley, also analyzed the JORs and determined that ████████████

████████████████ (A1575–79 ¶ 94.)

JOR data, Fort Dearborn admitted to processing variable data jobs using the JLYT file type, which IPT's infringement contentions and the Gafford expert report establish as infringing. (Maloney Decl. ¶ 22.) The motion does not deny this. (ECF No. 188 at 15.) However, Fort Dearborn provided information alleging that the volume of JLYT processing represents only about ███████ in revenue. (A1142.) IPT therefore stipulated to dismiss the claim for business reasons.

The allegation that 99% of Fort Dearborn's jobs are processed as non-Optimized PDF files is irrelevant to whether IPT had a good faith basis to file and pursue its claims against Fort Dearborn. Fort Dearborn has never produced sufficient business records to support its allegations that a mere 1% of its operations are at issue. And IPT had the legal right to maintain its claims against whatever quantity of JLYT variable data jobs would have been established by further discovery. However, given the discovery resistance encountered at every turn, IPT chose instead to conserve resources and voluntarily dismiss Fort Dearborn without demanding a settlement payment. That decision, and IPT's conduct leading to it, was imminently reasonable.

### d. Cenveo Was Dismissed Based On Representations That The "Majority" Of Its Print Jobs Use Non-Optimized PDF Processing

The complaint against Cenveo was filed January 2015. Discovery was stayed until the June 2015 initial scheduling conference following MDL consolidation. (ECF No. 5.) Cenveo served its first interrogatory responses on July 30, 2015, which indicated that ████████████████ ██████████████████████████████████████████████████ ████████████. (Maloney Decl. ¶ 23.) The response provided a high-level overview of aspects of Cenveo's processing of variable data jobs. (*Id.*) The response did not indicate that Cenveo only uses standard PDFs with the Optimized feature deactivated. (*Id.*; *see also id.* ¶ 20.) Cenveo provided additional interrogatory responses on December 10, 2015, including a response to an interrogatory requesting non-infringement contentions. (A1580–1601 at 1588–89.) The responses

were similarly high-level, incomplete and generalized. Once again, there was no mention of using

non-Optimized PDF processing, and no disclosure of a non-infringement defense directed to that.

(*See id.*) It was not until a February 26, 2016 supplement that Cenveo first asserted its alleged use

of PDF with the Optimized feature turned off. (Maloney Decl. ¶ 20.) Despite the requirements of

Rule 33, the responses were not verified by a representative of Cenveo when served, and remained

unverified until September 23, 2016. (*Id.* ¶ 23.)

　　　　Over the course of the entire litigation, Cenveo produced a total of 134 documents, none

of which corroborate that Cenveo has only processed variable data jobs using non-Optimized PDF

processing. The interrogatory responses indicate that when PDF is used, the specific PDF versions

are ████████████████   and that the Optimized feature is not selected. However, they do not

indicate that all variable data jobs were run using PDF ██████, but only that a ████████

████. (*Id.*) In the face of independent evidence from the HP JORs showing ████████████

████████████████   which is never acknowledged in the interrogatory responses, IPT

could only conclude that Cenveo was still hiding relevant information about the aspects of its

printing operations that IPT most cared about. Nevertheless, IPT stipulated to the dismissal of

Cenveo due to the risk that the expense of further discovery to obtain the missing details may not

be economically justified in the end.

### e.  O'Neil Was Dismissed Based On Representations That ████████ Its Print Jobs Use Non-Optimized PDF Processing

　　　　The first case against HP/O'Neil was filed in January 2014. *Industrial Print Techs., LLC

v. O'Neil Data Sys., Inc.*, No. 2:14-cv-48, ECF No. 1 (E.D. Tex. Jan. 29, 2014) ("*O'Neil I*"). IPT

attempted to confirm that relevant details of O'Neil's printing operations through interrogatories

and production requests. Interrogatory 1 requested a description of the processing steps on its HP

Indigo presses to create and print variable data jobs. Interrogatory 2 requested disclosure of

O'Neil's non-infringement contentions. The responses merely pointed to 547 pages of documents, none of which described those details. (A1206–08.) *See also O'Neil I*, ECF No. 57 (IPT's Motion to Compel). On September 9, 2014, O'Neil served first supplemental responses that provided a description of its process steps ███████████ (A959–65.) The responses also alleged that the process did not meet particular claim elements. (*Id.*) Another supplementation shortly thereafter continued to provide more descriptions couched in ███████████████████ weasel words. (*Id.*) In February 2015, O'Neil supplemented its response again, this time to include, among other things, an unhelpful statement that its use of ████████████████████████████████ ██████████████████████████ (*Id.* at A964.)

IPT's Interrogatory 12 asked for more detail about the steps of the variable data printing work flow used by O'Neil. O'Neil's initial response, served December 24, 2015, only incorporated by reference its responses to Interrogatory 1. (*Id.* at A980.) On March 1, 2016, O'Neil served unverified supplemental interrogatory responses that for the first time (in any response) raised a non-infringement defense alleging that it does not turn on the Optimized PDF setting of the Indigo printers. For the first time, O'Neil also characterized the PDF files generated in its workflow as ████████████████████████████████ (*Id.* at A986–87.) This supplement incorporated by reference the previous responses along with their caveats that the information provided only reflects O'Neil's operations ████████ (*Id.* at A980–81.) Despite the critical relevance of the information, O'Neil never served a response that purports to describe the relevant page description file types or processing details used for *all* variable data jobs run on its Indigo presses, and in particular all file types and processing involving bitmap save and reuse functionality.

Notably, all of O'Neil's interrogatory responses remained unverified until September 8, 2016. (Maloney Decl. ¶ 27.)[4] Moreover, O'Neil avoided producing any business records confirming the relevant details of its variable data jobs. By late January 2016, O'Neil had produced 85,597 documents. However, 10,393 of those documents were invoices and 75,073 were job summaries that did not contain the relevant details. IPT had obtained independent evidence from the HP JORs showing that ████████████████████████████████████████████

████████████████████████. If we accept as accurate O'Neil's March 1 response indicating that ████

████████████████████████████████ (Maloney Decl. ¶ 26), the logical conclusion is that O'Neil has withheld information about jobs ████████████████████████ (which IPT's expert deems infringing).

IPT's claims against O'Neil ████████████████████ have always had significant merit. But HP and O'Neil's own discovery conduct made it impossible to quantify the extent of this infringing activity. Faced with the possibility that additional litigation effort may lead to only limited damages, IPT agreed to dismiss the claims.

---

[4] O'Neil had given IPT many other reasons to be skeptical of the accuracy and completeness of its interrogatory responses. For example, the March 1 responses represented that: ████████████████████

████████████████████████████████████████████████ A981–82 (emphasis added)), but this was changed in a March 6 supplement to represent that: ██████████████████████

████████████████████████████████ (*Id.* (emphasis added).) As another example, O'Neil's witness testified that O'Neil's response to Interrogatory 3 requesting how many HP printers it operated was inaccurate. The response disclosed only █ T-Series HP Inkjet Presses and █ Indigo presses (A1208–09), while O'Neil's witness testified that O'Neil owns █ T-Series Inkjet Presses and █ Indigo presses, with additional presses in prior time periods. (A1602–04.)

B. **IPT's Discovery Conduct Was Reasonable And Tailored And Does Not Provide A Basis For Finding This Case To Be Exceptional**

Defendants cite no case in support of their argument that a party's discovery requests must be rigidly confined to claim elements (here, according to Defendants, processes involving bitmap reuse). (*See* ECF No. 188 at 18–19.) In any event, IPT's discovery efforts have always been focused solely on obtaining the information relevant to the patented subject matter. No request can be reasonably interpreted to request irrelevant information, let alone all information about Defendants' entire business as the motion now alleges. And to the extent Defendants read certain requests to be overbroad, they never hesitated to refuse discovery based on their own determination of what is relevant.

This portion of Defendants' motion is yet another rehash of their oppositions to IPT's motions to compel. (*See* ECF No. Nos. 41 (letter to Court regarding IPT's motion to compel identification of email custodians); 44 (status report regarding same); 53 (opposition to IPT's motion to compel variable data discovery); 63 (motion to strike IPT's infringement contentions); 66 (regarding March 29 hearing on motions); 90 (letter requesting to delay decision on IPT's motion to compel variable data discovery); 104 (regarding June 7 hearing on motions); 108 (motion to stay select portions of Judge Stickney's order granting IPT's motion to compel); 117 (objections to Judge Stickney's order granting IPT's motion to compel); 118 (letter requesting teleconference regarding June 24 deadline to comply with Judge Stickney's order); *see also* A1605–36, A1637–1739.)

In particular, Defendants desperately attempted to avoid the effects of Judge Stickney's order granting IPT's motion to compel discovery relating to the variable data patents. (ECF No. 97.) Defendants' present motion now wildly alleges that "IPT insisted on performing discovery on the entire business of these defendants, including a demand for every variable data PDF

21

printing project these busy printing plants performed. This was a massive and irresponsible waste of resources." (ECF No. 188 at 2.) That statement is plainly false, and nothing of the sort ever occurred. In fact, IPT's requests were drafted to avoid such burdens. No request to any called for even a single print job. They are narrowly limited, for example, by requesting information "sufficient" to confirm highly relevant facts. (A1757–93 at, for example, Requests 2–4 in each.) After extensive briefing and argument on these issues, this Court found the production requests addressed in the motion sufficiently reasonable to grant IPT's motion to compel and require the Defendants to produce responsive documents. (ECF Nos. 97, 121.)

The assertion that IPT requested discovery on all variable data print jobs and on all PDFs is also not accurate. (*See, e.g.*, ECF No. 188 at 19–20.) At the June 7, 2016 hearing, Defendants represented to the Court that Judge Stickney had ordered them to respond to a request for documents about "variable data without limitation to anything" (A1727) and that, with respect to O'Neil, this would amount to "the whole company" (*Id.* at A1729). This Court then asked IPT's counsel if IPT really wanted "all PDFs," to which counsel responded "No, your Honor" and explained that none of IPT's requests required production of all files or of an entire business. (*Id.* at A1729–30.) IPT also confirmed this again in additional briefing requested by the Court. (ECF No. 111.) The Court's subsequent June 22 Order acknowledged that IPT "does not seek discovery of *all* PDF printing by Defendants." (ECF No. 121 at 4.) The Order also set forth a definition of "Variable Data Print Jobs" to govern the additional discovery, which was the same definition that Defendants had previously sought: "Variable Data Print Jobs means 'Optimized PDF,' PPML for VDP, JLYT for VDP, and other equivalent printing processes that involve bitmap reuse." (*Id.*; *cf* ECF No. 103 at 2.) The Court provided Defendants three additional days to file any objections to this scope of discovery. (ECF No. 121 at 4.) Defendants did not object.

Defendants' complaint that the Court's limitation on of the definition of Variable Data Print Jobs "was too late" because "Defendants had already expended significant resources collecting and producing thousands of documents" (ECF No. 188 at 6) is an exaggeration at best. As of the June 22 Order, Fort Dearborn had produced only 25 additional documents, Cenveo 3 and O'Neil 221. Although HP had produced numerous documents, only a small percentage related specifically to Cenveo, Fort Dearborn and O'Neil. A summary of the HP productions is found at A1794. Despite any initial uncertainty regarding the scope of discovery ordered, the productions do not include significant numbers of documents regarding non-Optimized PDF processing or print jobs.

In short, there were no costs or attorneys' fees incurred by these Defendants beyond what the Court's Order on the motion to compel specifically required. Given the history of the case, and in particular the conflicting representations and incomplete half-truths given by Defendants throughout discovery, IPT's discovery conduct was completely reasonable. It was also consistent with the Court's orders. In the June 22 Order, the Court ruled:

> IPT is not required to further limit its claims or amend its infringement contentions at this time, but will do so within a reasonable time after it obtains the discovery ordered to be produced by this Court and by U.S. Magistrate Judge Stickney, if the discovery materials confirm that further amendment is required to make the contentions accurately reflect the products, services, and/or features that are accused of infringement.

(ECF No. 121 at 3.) IPT proposed to dismiss these Defendants from the cases shortly after their verified interrogatory responses. Negotiations on a stipulation and dismissal followed.

## V.   Even If Permitted, Defendants' Bill of Costs Is Overreaching With Substantial Portions Being Unrecoverable Under 18 U.S.C. § 1920

Defendant HP (but not the other Printer Defendants) filed a bill of costs totaling $56,839.40. (ECF No. 184.) This requests compensation for costs in several categories that are clearly not recoverable under § 1920. Nevertheless, the Clerk taxed costs for the total amount.

(ECF No. 193.) IPT did not file a separate formal objection to HP's bill of costs with the Court given that there would be briefing on the subsequently-filed motion requesting fees and costs. (ECF No. 188.) Defendants have asserted that the time for IPT to file objections passed because the Clerk of Court has already taxed costs. IPT disagrees, and requests that the Court exercise its discretion to consider IPTs objections to costs because (i) Defendants should not be deemed prevailing parties and (ii) several requested costs are not recoverable under § 1920. *See e.g.*, *Butler v. Munsch Hardt Kopf & Harr, P.C.*, 3:02-CV-1811, 2005 U.S. Dist. LEXIS 6661, at *3 (N.D. Tex., April 12, 2005) ("Although Plaintiff's objections are untimely, the five-day period for requesting review under FRCP 54(d)(1) is not jurisdictional, and consequently, the Court may review the costs issue at its discretion"). HP's bill of costs overreached in at least these major categories. To the extent it is entitled to recovery any costs, the amount should be reduced as explained below.

### A.    Fees Charged By Mediator Hesha Abrams Are Not Recoverable

HP seeks to recover fees charged by the mediator Hesha Abrams as fees incurred for "a court appointed expert." It is well established that mediator fees are not recoverable under §1920. *Cook Children's Med. Ctr. v. New England PPO Plan*, 491 F.3d 266, 277 (5th Cir. 2007). Any recovery of costs amount should thus be reduced by the $11,328.57 amount of mediator's fees.

Moreover, the mediation was an effort to resolve all of the pending litigation, including claims relating to the inkjet patents, which have not been dismissed. The bill of costs acknowledges that the inkjet patent litigation justifies a 50% reduction of requested costs, yet this adjustment was not applied to the mediator fees. (ECF 184.)

### B.    Fees For *Markman* Demonstratives Are Not Recoverable

HP seeks to recover $3,593.43 in charges from an outside vendor for preparation of visual aids for the *Markman* hearing. Fifth Circuit and district court cases have found that demonstrative

24

costs are not recoverable under § 1920. *See, e.g.*, *Coats v. Penrod Drilling Corp.*, 5 F.3d 877, 891 (5th Cir. 1993); *Baisden v. I'm Ready Productions, Inc.*, 793 F. Supp. 2d 970, 986 (S.D. Tex. 2011); *see also U.S. EEOC v. W&O, Inc.*, 213 F.3d 600, 623 (11th Cir. 2000). Moreover, none of HP's slides were unique to the dismissed printer Defendants, and HP would have incurred the costs regardless of the stipulated dismissals. Any recovery of costs amount should thus be reduced by $3,593.43, the amount of fees claimed for visual aids.

### C.      Fees For Court Appointed Expert

HP seeks $19,317 in charges from Mr. Woloson for services as an appointed technical expert for claim construction. Once again, HP failed to pro rate the fees to the variable data patents. This amount should be reduced by 50% to exclude Mr. Woloson's work directed to the inkjet patents.

## VI.      Conclusion

Defendants' motion fails to meet their burden to prove that this is an exceptional case. Nothing about the merits of IPT's case stands apart from others, nor did IPT act unreasonably in litigating the case. In light of the above, IPT respectfully requests that the Court deny Defendants' request to find this case exceptional and deny all requested fees and costs, including those previously taxed by the Clerk.

Date:   January 12, 2017                    Respectfully submitted,

                                            /s/ Timothy P. Maloney
                                            Timothy P. Maloney (IL 6216483)
                                            Nicole L. Little (IL 6297047)
                                            David A. Gosse (IL 6299892)
                                            FITCH, EVEN, TABIN & FLANNERY LLP
                                            120 South LaSalle Street, Suite 1600
                                            Chicago, Illinois 60603
                                            Telephone: (312) 577-7000
                                            Facsimile: (312) 577-7007

                                            *Attorneys for Plaintiff*


## CERTIFICATE OF SERVICE

The undersigned certifies that the following were served with a copy of **IPT'S OPPOSITION TO DEFENDANTS HP INC., O'NEIL DATA SYSTEMS INC., CENVEO, INC. AND FORT DEARBORN COMPANY'S MOTION TO DECLARE THIS AN EXCEPTIONAL CASE FOR ATTORNEYS' FEES AND COSTS** via electronic mail on January 12, 2017 per Local Civil Rule 5.1:

Edward R. Reines                            Audrey L. Maness
Amanda Branch                               WEIL GOTSHAL & MANGES LLP –
Robert S. Magee                             HOUSTON
WEIL GOTSHAL & MANGES LLP –                 700 Louisiana, Suite 1700
REDWOOD SHORES                              Houston, TX 77002
201 Redwood Shores Parkway                  Phone: (713) 546-5317
5th Floor                                   Facsimile (713) 224-9511
Redwood Shores, CA 94065                    Email: audrey.maness@weil.com
Phone: (650) 802-3000
Facsimile: (605) 802-3100
Email: edward.reines@weil.com
Email: amanda.branch@weil.com
Email: Robert.Magee@weil.com


M. Brett Johnson                            Michael Rueckheim
FISH & RICHARDSON, P.C.                     Jackob Ben-Ezra
1717 Main Street, Suite 5000                FISH & RICHARDSON P.C.
Dallas, TX 75201                            1221 McKinney Street, Suite 2800

26

Phone: (214) 747-5070
Fax: (214) 747-2091
Email: johnson@fr.com

Houston, TX 77010
Phone: (713) 654-5343
Email: rueckheim@fr.com
Email: ben-ezra@fr.com

*Attorneys for Defendants*

*/s/ Nicole L. Little*
Nicole L. Little
*Attorney for Plaintiff IPT*